Good morning, my name is John Lambros. I'm here for the appellant, Mr. DeMarlo Berry. I would like to reserve about 3 or 4 minutes of time for rebuttal, if I may. All right. The question presented to this Court is somewhat complicated, but I think if it's viewed by the Nevada Supreme Court, a fair statement of the question would be whether or not the advice that was given to DeMarlo Berry to waive his right to a unanimous jury under State law was the product of ineffective assistance of counsel, and whether ultimately Mr. Berry's waiver, while the jury, excuse me, after about 25 hours of in fact valid. And by that I mean, did the trial court impart from Mr. Berry a knowing and voluntary waiver of his right to a unanimous jury? And the Nevada Supreme Court concluded, citing Boykin, Johnson v. Zerbst, and several United States Supreme Court cases on the issue of whether or not a constitutional or statutory right can be knowingly and voluntarily waived, and said that, yes, indeed it had been, and that the State trial court had imparted a constitutional waiver. Now, the Nevada Supreme Court cited several cases that included United States Supreme Court cases on this point, Johnson, Boykin, those cases. Those cases, and the two cases that I would principally point out to this Court is the McKay case from Maryland and I believe the Taylor case out of Wyoming. Both of those cases, if you review those cases carefully, found that the waivers in those particular cases, in those particular prosecutions, were invalid. In the Wyoming case, they found the waiver invalid because the district court did not impart the necessary language from the defendant, or an on-the-record waiver from the defendant, that stated specifically that a mistrial in this case, if you were to decide to go forward with a mistrial, means that you would get a new trial with a new jury of 12 persons under Nevada law that would require unanimity on each and every element of the offense for each and every count. This was robbery, in my case, it was robbery, burglary, and theft and felony murder with the use of a deadly weapon. And that you would be, the jury would be instructed that you are presumed innocent. That did not happen. If you look at the record in this case, that simply did not happen. Now, the Nevada Supreme Court's conclusion to the contrary, with all due respect to that Court, was wrong. As a matter of Edpil law, it was contrary to and an unreasonable application of the United States Constitution as interpreted by the United States Supreme Court. Ginsburg. Let me understand your claim. You're not claiming that a unanimous jury is not subject to waiver. Is that correct? Horwich. No, I'm not. And that was the claim that was defaulted in the court below. Ginsburg. Right. Okay. So what you are claiming that the waiver, as ruled on by the preliminary to the alleged waiver, was sufficient. Horwich. Yes. I'm claiming both, and that's the reason that this is somewhat confusing is because of the, well, first of all, and it's an issue that I addressed in my briefing with regard to the non-certified claims, our office was appointed by this Court on direct appeal, and quite frankly, again, with all due respect to the trial court below, there should have been appointment of counsel, because I think that the case would have been much more clear. Definitely, much more clear. But that's kind of a long-winded answer to your question, Your Honor. We're arguing both. We're arguing both that this was an uninformed decision, all of the Sixth Amendment under Hill v. Lockhart, by counsel. Counsel's decision was, excuse me, counsel's decision was sufficient. And we are also arguing, and this was reviewed by the Nevada Supreme Court, it was litigated below, in front of Judge Mahan, and the State's position to the contrary in the answering brief is somewhat, with all respect, disingenuous, since in their answer below, they treated this as a waiver case. They cited waiver case. In fact, they specifically cited to a United States Supreme Court case entitled United States v. Mezzanotto, 513 U.S. 196. And that's at the excerpts, in my excerpts of record at pages 547 through 549 in their answer. And the Mezzanotto case is a waiver case. It's a U.S. Supreme Court case that talks about how a criminal defendant in a Federal prosecution can waive their right to having plea negotiations be confidential. Let's first examine the advice of counsel as to why that was ineffective. Well, if you view this case in terms of what was happening when Judge Mahan tried the State court trial, Judge Mahan stopped the proceedings to discuss this proposed agreement between the State and the defense, what we knew, because there was never an evidentiary hearing on this case, the lawyers never testified, the defendant never got a chance, Mr. Berry never got a chance to testify. We knew that this was a strictly eyewitness case, five eyewitnesses. The jury, after almost 12 and a half hours of deliberation, wanted a readback of all of the eyewitnesses. No forensic evidence linking Mr. Berry to this case. Mr. Berry testified. Mr. Berry denied any complicity in this. He said that he was somewhere else at the time. There was corroborating evidence that he was actually questioned, stopped by a police officer, and let go on the night of the murder. He was 19 years old at the time. I think that's a factor that weighs in favor of a jury not finding death, quite frankly. The only aggravator, the only aggravator that the State of Nevada purported in support of the narrowing function to make this a death case was that the murder was committed in the course of the robbery, in other words, the felony robbery, felony murder robbery, which since, ironically, in Nevada has been found to be unconstitutional. In other words, if you're proceeding under a theory of felony murder, you cannot use the robbery to enhance the, to enhance, as an aggravator to find death. It was a racially charged trial. During jury selection, I believe the first day of trial, there was a bomb threat with a racial epithet connected to the bomb threat connected to my client. Prior to the, prior to the decision that was presented to Judge Maupin, there was a note from the, from the holdout juror. I think it was a note, but somehow Judge Maupin and the lawyers all were, were advised by the jury, by the holdout juror, that there was a racist in the majority, a racist juror in the majority. Now, there was some question as to whether or not the holdout said racist or prejudiced, but nevertheless, the record, that was, that in-chambers conference was never transcribed. So what, so what you have here is advice to essentially, in, in my opinion, given the state of the record, advice to concede guilt in exchange for not exposing oneself to the death, to the death penalty. Now, superficially, that seems, again, superficially, and I believe I'm not meaning to suggest that I'm conceding this, but superficially, that seems like a good idea. But when you, when you weigh all the, when you take all of these other factors into consideration, I, I submit to this Court that it was an illusory, if best, benefit that Mr. Berry received under the advice of his attorney. How was it illusory? Had the Court declared a mistrial, there would have been a new trial, and he would have faced the death penalty. Yes. What he got out of this deal was a concession by the government, by the state, that he would not face the death penalty. He also received- And that the jury still, they didn't know, I guess they, they had a strong inclination to understand that it was probably 11 to 1 for guilt. Yes. But they didn't know. They did not know. And that, that is, I, and I, and I'm not going to stand up here and say that, that- I have no idea. I think the only time I've seen it was in the case, the eyewitness testimony and so forth, was before the jury. Yes. One thing that, one thing that he, he certainly would have known, again, and we don't know this because there wasn't, there wasn't the kind of evidentiary hearing that was conducted in the 11th Circuit case, the Sanchez case, where all of the lawyers and defendants testified as to the benefits of the bargain. We certainly do know one compelling thing, and that is that the next jury that would sit in judgment of Mr. Berry would hopefully not contain a racist. And I think that that is a compelling, a compelling piece of information. And the reason that, and again, I don't mean to, don't mean to sound flip about this, Judge Alicorn, but I, I really think, and again, having done some death penalty work in the last 25 years in Nevada, it's a great deal to get the death penalty taken off the table. And I'm not going to sit up here and say that it's not. But under these circumstances, under these facts, under the facts of this case, I believe that it was deficient. You absolutely meet the first prong of both Strickland and Hill to advise Mr. Berry to take a guilty verdict. Because, quite frankly, and again, now we need to speculate, but with this Court's indulgence, I will, if the mistrial had been declared and a new trial granted, the first thing I would have done is interviewed all 12 of those jurors to discuss exactly where they were coming from. And quite frankly, and again, speculation. The new 12 or the previous 12? The previous 12, the 12 that hung, the 11-to-1. And, you know, you're always in, I think, as a defense attorney, you're always in a much better position after a hung jury because you can sit down and talk turkey with the district attorney. If they don't want to try the case again, they might have put, you know, well, we'll put life with or without on the table now. Let's just don't go through this again. So that's why I say the deal was illusory. Why not find out? But that is speculation. I mean, they may have said, you know, why should we concede this now? We're just going to take it to trial again. And especially because we know where the jurors stood at the end of the first trial. So what we're weighing here are two equally probable ways for the defense attorney to have viewed this, which was it's a safe deal, or we can roll the dice, but there may be some outs for us before we have to get to the end of that road. Right. So it's – I think it's hard under the Strickland standard to figure out why taking the first one, which is a sure thing, and as it turns out, in hindsight, you know, the jury was tilted against him, was a sure thing, they were probably going to retry the case. Why wouldn't that be within a range of reasonable legal advice? Well, because, again, and I really want to mention one thing that I think is very important. It's unfair right now. What we're doing is unfair, and it is clearly contrary to Strickland and an unreasonable application of Strickland to speculate, because this should have been flashed down at an evidentiary hearing. This really should have been. But – and quite frankly, at the very least, I'm hoping that that's what this Court will do if we don't win outright and get a conditional writ grant. But having said that, in response to your question, I think that, again, under these circumstances, any reasonable defense attorney that does death penalty work would have assumed that what he or she was advising his client to do would be to plead guilt, would be essentially concede guilt, with a racist on the jury that would go to the penalty phase. And now, you know, you might be taking death off the table, but you might be guaranteeing your client a sentence of life without. And we don't know exactly how this was pitched to Mr. Berry. We don't know if it was pitched, you know what, I think it's 11 to 1 acquittal, or do you know what, I think it's 11 to 1 guilt. Well, that's within his ability to tell us in terms of putting in his papers. And I think he did that in his conviction petition. I think he said that, you know, this, this, I didn't understand that a hung jury was like a victory. A hung jury meant that I'd go back and get a retrial, which really is a perfect segue to talk about where this, where, you know, the, the, one of the essentially critical problems in this case is it can be decided on the record as it stands without any need for any additional fact-finding, and that is the fact that the waiver canvas did not satisfy Johnson v. Zerbst and Boykin v. Alabama. It clearly did not. And the reason that it did not was Mr. Berry was never told that in exchange for the State's decision to not pursue death, you will give up your right to a new trial with 12 jurors who would have to find unanimously beyond a reasonable doubt each and every element of the offense, and you would be cloaked with the presumption of innocence. He was never told that. So really, by the judge, by the judge, he was never told that. We don't know. And we, we don't know, and one thing, there's nothing in this record that says that he was told that by his lawyer. So we don't even have that, and I wouldn't concede that that would be good enough under, under Johnson and, and Boykin. One, one thing that interested me, you were saying that if, if you took the hung jury and said, all right, new trial, and you'd have an opportunity to interview the jurors, then you could sit down with the DA and maybe work out something where there would be life without, with the possibility of parole. That's exactly what he got. Right. But see, and, and again, I think that if he had just decided, look, you know what? Why should I give up death under these, why should I, why should I accept this deal under these circumstances, given, given this case, when I have a guaranteed new trial, if I just, if I just decide to go ahead and have a hung jury here? But the new trial then, of course, has the risk of, of death. Correct. But the State's case isn't getting any better. You know, this is not like, okay, they hung it the first time, the second time around, it's going to be a six-inch putt. That's, it's just not that kind of case. In fact, if anything, again, humbly, I, I would, I would enjoy having the opportunity to go back and cross-examine those eyewitnesses one more time, having them already on the record, both in a preliminary hearing and not all of them testified at the prelim. So this was the first time for a couple of those eyewitnesses that, that counsel got a chance to really take their measure of them. Mr. Lambrose, I'm interested in your reliance on Boykin. Boykin was the case which, which instructed all of us what must be done in taking a guilty plea. Yes. In this case, it's clear that the defendant was aware that he was entitled to a trial by jury because he was undergoing a trial by jury. Right. I would suspect if we look at the instructions that were given by the court, there was a reference to reasonable doubt. So how, how can we assume that the defendant was unaware of these things when he was sitting there waiting for a 12-person jury to come back with a verdict? Right. With a reasonable doubt instruction in his favor. Yes. And, and my reliance on Boykin is somewhat, well, it's, it's, it's like a compares favorably type of reliance. It is on point because, well, the Nevada Supreme Court cited to Boykin when, in, in their ultimate conclusion and in their ultimate holding because what they said was, we, we, under these circumstances, we find that you can constitutionally waive our, the State right to a unanimous jury verdict so long as the waiver is knowing and voluntary. And that's, that's the Boykin language that I'm talking about. The on-the-record discharge of a right, constitutional or statutory rights, so long as it's knowing and voluntary, it's informed by counsel, and it's ratified and, and confirmed by the court on the record. And that's the same thing with Johnson v. Erps, which was, I believe, a waiver of counsel case. So, yes, it's, it's, this is, this was not a, this was not the full-blown Boykin waiver of all the panoply of constitutional rights to plead guilty. Isn't this closer to North Carolina against Alford, where the defendant said to the judge, yes, I'll plead guilty, but I'm innocent, but I don't want to die? Yes, and, and, and, and in Alford, before that, before that plea is constitutionally valid, two things must occur. There must be either the Boykin kind of canvas, well, actually, it's not in the alternative. The defendant needs to know the constitutional rights he or she is giving up. But the factual basis for the plea, in other words, admitting facts that support the elements of the offense, is substituted. Yes, but, but the reason that the, the reason that the United States Supreme Court ratified Alford or, or affirmed Alford was they were satisfied by the State's proffer that, okay, you know, if we were to go forward and, and, and try, and, and try this case, these are the fact, this is the evidence we could present. And the defendant would not contest those facts. An Alford plea was a plea of comfort for the defendant, so the defendant did not have to admit, admit facts. But it was still constitutionally acceptable, so he could, he or she could avoid a harsher penalty. And in Alford, it was death. But I think that's the distinction. You still had to have an on-the-record valid constitutional waiver. You had to be, there has to be a record somewhere that everybody's satisfied that the defendant knows what he or she is giving up in exchange for the benefit. Well, the determination of factual basis was for the judge, not, not for the defendant. In Alford? Yes. Absolutely. But it was proffered by the State on the record. Let me just clarify one other thing. I'm interested in your point about a hearing which was not granted in the district court. Was there a hearing, but no, what we would call live hearing in the state court? Yes. What happened in the state court was there was oral argument. It took, yeah, it took about 15 pages of transcript. There were never any witnesses presented. And she was represented by counsel? Yes, she was represented by counsel. Okay. Yes. We'll hear from Nevada. Thank you very much. May it please the Court. Good morning. My name is Jamie Resch. I'm from the Nevada Office of the Attorney General. Here on behalf of the respondent today, George Grigas. I'm a little troubled by some of what we heard here just now, simply because there's only one issue before the court, and that is the ineffectiveness of Barry's trial counsel. It seems like there is a plan to inject a couple of other issues into the case, one being that the trial court's canvas of Mr. Barry's waiver was somehow deficient, another being a sufficiency of the evidence argument. Those issues were not in Barry's petition. And even in the state court proceedings where Barry had an attorney, those issues were not presented. So to the extent I can, I'd like to at least focus the court's attention here today on the sole issue, which is simply whether Barry's trial counsel is ineffective in advising him to waive his right to the unanimous jury. On this being a habeas case, this isn't exactly a direct review type situation. Under 28 U.S.C. 2254, we determined whether the Nevada Supreme Court's decision was contrary to or an unreasonable application of clearly established federal authority. I was going to talk more about the Johnson and Apicotta cases, but I feel like we've heard here today that counsel is conceding that those established that a state court criminal defendant does not have a constitutional right to unanimous jury. To the extent that Barry did have such a right, it arose solely under state law. And to that extent, the Nevada Supreme Court determined that, indeed, he could waive that right and that he did, in fact, waive that right in a knowing and voluntary manner. Specifically, the Nevada Supreme Court took a look at what other jurisdictions have done as well, not just the United States Supreme Court, but they looked at the circuit court decisions as well as other state court decisions. And the Maryland case is particularly useful simply because in that case there was no express language authorizing a waiver of a unanimous jury in state court, and yet that court determined that it was possible to do so. Applying those factors, the Nevada Supreme Court determined that, indeed, if the waiver is knowing and voluntary, it can be made. And that's exactly what Barry did in this case. There may not be a good decision. I'm sorry, which? Why was that not an ineffective decision? Barry's decision to waive his unanimous jury? Well, simply because under Strickland, the concern is, well, you know, was it an objectively unreasonable thing for counsel to do and did he show prejudice arising from it? In this particular case, he obtained a clear tactical advantage, which is that the State agreed to drop the death penalty if he would take this non-unanimous jury. You know, we've heard the discussion that that was illusory, but that's simply not true. Whether there's an argument to how strong the death penalty case was, the fact remains that at the time this decision was made, the jury was still deliberating. Death was still on the table, and it was going to be on the table if there was a mistrial and a subsequent retrial. How likely was it that he would be convicted of and be sentenced to death? Well, again, the sufficiency of the evidence argument is not before the Court here today. But it is in a sense, because that bears upon his the reasonableness of his decision. Of course. And I would comment that we do now have the information that at the time 11 jurors were voting guilty, one was voting not guilty. So the argument that, well, the defense could have interfered. I didn't know that. So what I guess what I'm really concerned about is what were the facts of that case that made it really worrisome that he would be convicted and sentenced to death? The facts of the case in the trial court? Yeah. In this Berry's case. Well, what he did was rob a Carl's Jr. and murdered somebody during the commencement of that crime. The reasons for the State seeking the death penalty, you know, we've heard about them from counsel. And we don't have the complete trial court record here before us today. But we do know that a robbery was committed. We do know that he used a deadly weapon during it. And he was facing the death penalty as a result of that. I can't stand here today and — Well, just felony murder wouldn't justify the death penalty. That's true. But, again, this being a robbery, and he apparently obtained property during that robbery. I'm aware that that is also a modifier in Nevada law for imposing the death penalty. Nate, when I ask the question counsel raises is, you know, we all can sit here and speculate forward and backward, which we're not really supposed to do exactly. But we don't have much of a record even on which to speculate here. There really was no hearing. We don't have from the lawyer. We don't really have from the defendant a clear statement. Why wouldn't this be an appropriate case for a hearing in light of the somewhat truncated record in the State court? Of course. And I guess I would focus on the issue that's before the court, whether his trial counsel was ineffective. What should have been in the petition at any point during time, even in State court where he had an attorney, is allegations that, you know, his trial counsel had actually done something objectively unreasonable and that Barry actually would have done something differently had he been better informed. Instead, what we have is a situation where Barry's never actually identified what it is that trial counsel did wrong. He's mad about the advice that he received, of course, but I think we've established. Well, that's what he – I think that's the allegation of what he did wrong, is that he gave him the advice to go ahead and plead rather than get a new trial. But I think at this point we're able to all agree that trial counsel was able to render the advice that it was constitutionally permissible to waive the right to unanimous jury. That's true. Okay. But why wasn't it an advantage for him to not get a new trial with the likelihood that there would be a lesser conviction? Well, the problem is there never was going to be a lesser conviction. I suppose he could have been acquitted, and we'll never know that. But out of the options that he faced, you know, the death penalty was obviously the most extreme. But for a conviction for a murder such as he was convicted of, the other options were life with the possibility of parole and life without the possibility of parole. Out of those, he received the least of those three, life with the possibility of parole. So to be able to go back and speculate is – How about an acquittal? Obviously an acquittal is possible. However, we've, you know, we've never heard that he's – he's never suggested that he actually did not commit this crime. He's never alleged prejudice in terms of, well, you know, if I had been better advised, I wouldn't have taken this deal because I could have been acquitted. You see, the problem I have is I don't know enough about what happened at that 7-11 or whatever it was. Yes, Carl's jury. Yeah. Well, you know, if we had the lawyer, the lawyer might say, you know, I hear all this, but what concerned me was, you know, the eyewitness testimony did concern me. And I thought that the State wouldn't agree to a deal, that they'd go back to trial and then you might be back in the debt. You know, you'd have this sort of articulation of all those things if that was his strategy to advise him to take the – to take the deal. But we don't really have a record of that, do we? We have some of that. I mean, included in the record was excerpts that, indeed, there were five or six eyewitnesses. Barry walked into the restaurant, threatened somebody with a gun. We don't have as the – we don't have the lawyer – we don't really have the lawyer's evaluation of why this was the proffered advice. I mean, it's – we all – we finally got through the point, which you brought up right at first, that we got through what much of the briefing was focused on this is it constitutional or not. But we – that was an easy question. It definitely is constitutional. And the lawyer was well within the law to make a recommendation. The question is whether the recommendation was reasonable. Well, and I would suggest that under Strickland, the presumption is going to be that trial counsel was adding – acting adequately, that they were performing a reasonable, competent job. He had counsel during the trial. She sat there the whole time, presumably made objections, weighed the evidence, was able to evaluate it as the trial unfolded. And at the conclusion of that, as the jury is deliberating, she makes the decision that, look, she had an on-the-record discussion with Barry. We can only assume that she explained, look, here's a deal that we might be able to make. It's going to save you from the death penalty. Obviously, there's a chance that you could be acquitted. And even at the time the deal was made, that chance still existed. This was somewhat better than a deal where he simply agreed to plead guilty, because there was that chance, no matter how unquantifiable at this point, that the jury would have come back 11 in favor of acquittal, and he would have simply gone free. We can only assume that all this was presented to him. It was presented in open court with him on the record. The trial court canvassed him. He said he understood that the trial court made the comment that I'm prepared to declare a mistrial, that there would be a new trial in this case, and Barry said he wanted to get it over with. So at this point in time, I don't think it's appropriate under Strickland to go back and try to second-guess those things. In fact, the whole case is essentially a textbook for why we don't go second-guessing trial counsel's activities so long after that. Well, so long as we know what happened in the – and maybe there's somewhere in the record that I'm missing. It sure wasn't in the briefs. But what happened at that Burger King? What was the – what was the evidence? Did he have a reasonable shot to get the things? Okay. Well, and my first feeling being under Strickland, we should focus on the decision of his trial counsel. And the presumption is that she was performing adequately. And that was explained, too. Well, my assumption is, but what I'm trying to find out is whether that was a reasonable decision in light of the facts of what could be proved at a retrial. And I think we have an adequate enough record before us to make that decision. There were five or six eyewitnesses, one of which went straight from the restaurant right in front of me. Okay. Now, you see, you're not so fast. Tell me what happened at that Burger King. Okay. Well, I wasn't there, of course, but as we have the record in preflux. I'm glad you guys are. The record that we have reflects that a black male walks into the restaurant, threatens somebody with a gun. That person proceeds to leave the restaurant and is able to make a positive identification of Barry. Barry then apparently goes in the back. And we know later from comments he apparently made to a jailhouse snitch type person that what took place was that he had somebody kneel down and basically shot him in the back, which resulted in the person's death. Barry was then seen fleeing the restaurant, also threatened some people outside the restaurant with a weapon. So just based on that limited record that we have before us. You said there were five eyewitnesses to him leaving? That's correct. Well, to my understanding, that's correct. There was at least the one lady inside of the place who then proceeded to leave and make an identification. We also have a series of people outside of the building who see him with a gun. In fact, I believe Barry even threatens at least one group of them with the weapon. So given the limited purpose of our review here today, along with the record that we have before us, we can establish that, indeed, there was evidence of his guilt. I mean, that part is further presumed by the fact that 11 jurists were prepared to come back with guilty and only one not guilty. Well, he didn't know that. He did not know that. Did the person you characterized as a snitch testify at the trial? I believe so. There was then either an admission or a confession in addition to the eyewitnesses. I presume for that testimony to come in that he would have had to testify directly. So I guess we're to the point where we're winding down here. Again, this being a Strickland case, the Nevada Supreme Court applied that, applied Strickland, took a look at all of these issues that we're considering here today and determined that trial counsel was functioning adequately. The district court agreed with that analysis, essentially. The district court did something a little bit in addition, at least in a footnote, to go ahead and address the problem that Berry has never once alleged prejudice in any of his petitions, whether in state court or federal district court. The district court went on to evaluate that, well, not only that that was fatal to his claim under Strickland, it being a mandatory element of the analysis, but that the evidence that we do have from the trial court's canvas indicates that Berry did want to get it over with, that even if he had been advised that for whatever reason this wasn't a good deal, it sounded like from the evidence we have that he would have wanted to proceed anyway. Unless the Court has any other questions, I think that's about it. Thank you. Thank you. I have a question for you on the hearing issue. Even though it was a court argument but not a hearing, he was represented by counsel and the ability to bring the other counsel's affidavit to an interview tour and bring an affidavit or whatever, that was available. So we have some case law that if you didn't really take advantage of this in the state court, then the federal court can't put a Band-Aid on it after the fact. What is your response to the situation that's presented here? Well, you're absolutely right. Whether or not Mr. Berry is entitled to an evidentiary hearing under EDPA, I believe, is driven by whether or not he had an opportunity or he made an attempt or he made a diligent effort to pursue that fact development in state court. And he did have counsel in state court. And I cannot tell you why it was that state post-conviction counsel did not do that. We don't have an affidavit from the original trial counsel, correct? We do not. We have nothing from the original trial counsel. But he made his assistance of counsel argument to the state court, to the state district court. Right. And his petition was, you know, was filed under verification and that kind of thing. So the allegations. Was there evidence in the initial trial that he had had the attendant kneel down and shot him in the head? Judge Hugg, the trial record was never made a part of the record in the court below. And if I had been representing Mr. Berry, I would have done that. But, of course, the State of Nevada gets to sort of call the tune when they're litigating against somebody who's in a prison cell and they saw fit not to lodge the trial record. I believe that given what I know of the trial record from the briefing and the opening briefs and that sort of thing that were made a part of the record below, it was that type of a murder. Yeah. It was an execution-type murder, which really is a bad fact. There's no question about it. Yeah. Which would make it more reasonable then for under Strickland for the trial attorney to say if he could get rid of the death penalty, it was a significant thing. Yes. Yes. But I think that what really needs to be emphasized here, and I kind of heard my opposing counsel say one thing and then say another thing, and essentially the waiver issue is it was litigated in the State court. It was litigated in the district court. Counsel that represented the attorney general litigated, you know, addressed the waiver issue in their answer. Counsel stood up here and said the Nevada Supreme Court found that the waiver was valid. Okay. Well, that's the gravamen of my point with regard to what does not need record development. And I would urge this Court to look at two pages of my excerpts, of my three volumes of excerpts. The first page is at page 559, when defense counsel tells the judge what it is she and her co-counsel had done with regard to telling Mr. Berry to take this decision. Nothing in there about what is required under the Constitution. And then to take a look at pages 562 and 563, when the trial court, quote, unquote, canvassed Mr. Berry on whether or not the waiver was knowing, voluntary, and adequate. All right. Thank you. We'll take a look at those excerpts. I appreciate the argument from both counsel. And the case of Berry v. Griegas is now submitted and will adjourn for the morning.
judges: Hug, Alarcon, McKeown